Anthony DIAZ, Paul Diehl, and
Allan Kaminsky, Plaintiffs,

v.

Michael FARLEY, Morris Matthews, Joan
Abele, Cottonwood Obstetrics & Gyne-
cology, Old Farm Obstetrics & Gynecol-
ogy, and John Does I–X, Defendants.

Civil No. 94–C–1184B.

United States District Court,
D. Utah,
Central Division.

July 17, 1998.

Eliot Cohen, Peggy Tomsic, Salt Lake City, UT, for Anthony Diaz, Paul Diehl, Allan Kaminsky.

George Hunt, Elliot Williams, Salt Lake City, UT, for Joan Abele.

Paul Matthews, Randy Austin, Salt Lake City, UT, for Morris Matthews.

Stephen Marshall, Steve Gordon, Salt Lake City, UT, for Michael Farley.

Ryan Tibbits, Brent Stephens, Salt Lake City, UT, for Old Farm Obstetrics & Gynecology.

Kenneth Yeates, Salt Lake City, UT, for Cottonwood Obstetrics & Gynecology.

## MEMORANDUM DECISION AND ORDER

BENSON, District Judge.

This case arises out of a dispute between anesthesiologists at Cottonwood Hospital in Murray, Utah. The plaintiffs are three anesthesiologists, Drs. Anthony Diaz, Paul Diehl, and Allan Kaminsky, who have staff privileges at the Hospital. The individual defendants are three anesthesiologists, Drs. Michael Farley, Morris Matthews, and Joan Abele, also with staff privileges at Cottonwood Hospital. Also named as defendants are two entities, Cottonwood Obstetrics and Gynecology ("Cottonwood Ob/Gyn") and Old Farm Obstetrics and Gynecology ("Old Farm Ob/Gyn"), both of which are groups of Obstetricians/Gynecologists who regularly deliver babies in Cottonwood Hospital's Labor and Delivery room.

In February, 1994, one of the defendants, Dr. Matthews, entered into a contract with each of the two obstetric/gynecology entities. The contracts obligated Dr. Matthews himself or another anesthesiologist selected solely by him to provide anesthesiology services for the patients of these two entities who are admitted to Cottonwood Hospital's Labor and Delivery room. After the contracts were signed, with minor exceptions, the plaintiffs were not selected by Dr. Matthews to perform these anesthesiology services. The plaintiffs complain in this lawsuit that Dr. Matthews' contracts with the entities are part of a combination or conspiracy by the defendants in restraint of trade in violation of Section One of the Sherman Antitrust Act. The plaintiffs contend that the conduct of the individual anesthesiologist defendants amounts to a horizontal group boycott and therefore a *per se* violation of Section One. The defendants argue that their conduct is not in violation of the Sherman Act in any respect, and in any event, should be subject to a Rule of Reason, rather than a *per se,* analysis.

This case came on for hearing before the court on March 26, 1998 on the individual anesthesiologist defendants' motion for summary judgment. The plaintiffs were represented by Peggy Tomsic and Eliot M. Cohen. Defendants were represented by George A. Hunt, Randy T. Austin, Stephen Marshall, R. Brent Stephens, Kenneth W. Yeates, and Steven K. Gordon.

## BACKGROUND FACTS

A. Cottonwood Hospital and the Anesthesia Department

Cottonwood Hospital is owned by a subsidiary of Intermountain Health Care ("IHC") which also owns two other hospitals in the same area. Cottonwood operates under an "open staff" policy which means that any medical practitioner may apply for staff privileges at the hospital. Staff privileges are defined as the permission granted to a medical practitioner to provide patient care at the hospital and includes access to hospital resources that are necessary to effectively provide that care.

Anesthesiology services at Cottonwood Hospital are provided by the members of the Department of Anesthesiology, all of whom are licensed anesthesiologists who practice medicine independently of each other. They are not considered employees of the hospital. The department's purpose is to schedule anesthesiologists to cover the hospital's needs.

Cottonwood Hospital requires anesthesiologists to cover four areas in the hospital: (1) the operating room ("OR"), (2) the orthopedic specialty hospital ("TOSH"), (3) the surgical center, and (4) the labor and delivery room. Each area requires a certain number of anesthesiologists each day. For example, prior to November of 1993, the labor and delivery needs were met by scheduling one anesthesiologist for a 24 hour shift beginning at 6 p.m. and running until 6 p.m. the next evening.

Historically, anesthesiologists regularly working in one of these four divisions have not been regularly scheduled in another division. The OR and labor and delivery (or "obstetric") divisions have each had a certain number of "slots," or physicians, who rotate in the schedule. Generally speaking, a new physician has been added to the rotation of either OR or obstetric anesthesia only when another physician left.

Until November, 1993, anesthesiology scheduling was done by two anesthesiologists in the department. After November, 1993, a single anesthesiologist has been selected as scheduler by a two-thirds majority vote of the Department members. Since November, 1993, defendant Dr. Farley has been the elected scheduler. As the scheduler, Dr. Farley is responsible for making certain that a sufficient number of anesthesiologists are assigned to cover labor and delivery, the OR, the surgical center, and TOSH at all times.

## B. The Plaintiffs

Plaintiff Anthony Diaz became an active member of Cottonwood Hospital's Department of Anesthesiology in 1980. He practiced general anesthesiology, including obstetric ("ob/gyn") anesthesiology, at Cottonwood between 1980 and 1982. In 1982, Dr. Diaz left Cottonwood and practiced medicine in Alaska. In 1990 he returned to Utah and resumed working at Cottonwood. From 1990 to 1992, Dr. Diaz did some "fill in" anesthesiology work on the labor and delivery schedule at the rate of approximately two shifts per month. In 1993, Dr. Diaz requested significant additional labor and delivery shifts.

Plaintiff Paul Diehl joined Cottonwood's Anesthesiology Department in 1981, performing ob/gyn anesthesia there until 1985. In 1985, Dr. Diehl decided he no longer wanted to do ob/gyn anesthesia and voluntarily traded his labor and delivery shifts for shifts in the OR. In 1993, Dr. Diehl requested to again receive significant work in labor and delivery.

Plaintiff Allan Kaminsky joined Cottonwood's Anesthesiology Department in 1980 where he performed ob/gyn anesthesiology until 1983. In 1983, Dr. Kaminsky voluntarily traded his obstetric shifts at Cottonwood for shifts in the OR division. In 1993, Dr. Kaminsky asked to be included again in the labor and delivery schedule.

## C. The Defendants

Defendants Michael Farley, Morris Matthews, and Joan Abele are all licensed anesthesiologists who hold active staff privileges at Cottonwood Hospital. Dr. Farley has been a member of Cottonwood's Anesthesia Department since 1986; Dr. Matthews has been a member since 1983; and Dr. Abele was a member from 1983 to 1996. All three individual defendants were part of a five physician rotation that regularly performed anesthesiology in labor and delivery for many years prior to 1993 when plaintiffs began demanding significant shifts in labor and delivery. In addition, as stated above, Dr. Farley has been the scheduler for the Anesthesia Department since November, 1993.

## D. The Dispute Over Scheduling

As explained above, by late 1993, the three plaintiffs and at least one additional doctor, Dr. Welling, were requesting additional shifts in labor and delivery.[1] Although the record is not totally clear, it appears that prior to the plaintiffs' requests, five doctors, including

---

1. It is uncertain why the plaintiffs so vigorously demanded to rejoin the labor and delivery schedule. Although the record is not clear whether labor and delivery shifts became more financially lucrative in 1993, the record does state that labor and delivery shifts are presently more lucrative than the OR shifts. Plaintiffs' Memorandum in Opposition to Summary Judgment at Iiv, ¶ 173.

all three of the defendant doctors, were regularly rotating in the labor and delivery schedule. About the time plaintiffs began requesting labor and delivery shifts, one ob/gyn anesthesiologist left, creating one open slot in the rotation.

The defendants were wary about plaintiffs' sudden demands to return to labor and delivery and they have offered several reasons why they were hesitant to fully embrace the plaintiffs' requested return. First, the defendants were concerned that plaintiffs' ob/gyn anesthesiology skills had diminished during their extended absences from ob/gyn anesthesia. Second, the defendants were concerned that plaintiffs' entry into the labor and delivery schedule would disrupt the smoothly running ob/gyn system. The labor and delivery schedule had been separate from the OR schedule for approximately ten years and neither the OR nor the labor and delivery schedule had accepted new doctors unless a slot was open or the need required more doctors. The defendants also had their own interests at heart. Introducing the plaintiffs into the schedule would necessarily decrease the defendants' total number of shifts.

The friction between members of the Anesthesiology Department over scheduling led the members of the department to discuss the issue at a meeting on November 23, 1993. The record shows that at the meeting the members concluded that the plaintiffs would be scheduled for "some" labor and delivery shifts. Additionally, the minutes of the meeting indicate that plaintiff Diehl revealed to the other members of the department that he had retained legal counsel for the purpose of receiving privileges in ob/gyn and cardiovascular anesthesia.

The November meeting did not completely resolve the scheduling issue among the anesthesiologists. On December 6, 1993, the members of the Anesthesia Department met again to discuss whether the three plaintiffs should be given new "slots" so that eight doctors would work equally on the labor and delivery schedule or whether the three plaintiffs should be given one slot to share among the three of them. The minutes indicate the department members decided the ob/gyn an-

esthesiologists would meet separately to discuss the issue. The record does not indicate whether the ob/gyn anesthesiologists actually met on a later occasion. Apparently, the plaintiffs continued to work to some extent in labor and delivery, but with no definite resolution of the scheduling issue.

After the December 6 meeting, tension was running fairly high in the Anesthesia Department. As noted above, Dr. Diehl had retained legal counsel. Defendant Matthews wrote in his journal: "We have some problems in the department. About half of the people are easy to get along with and all the surgeons will work with them. The others have personality quirks or are slow, and some surgeons request not to have them." Morris Matthews' Journal, Dec. 18, 1993. At some point, defendant Abele reportedly told another doctor that Dr. Diaz was slow, Dr. Kaminsky was hated, and that co-workers "had issues" with them. Like Dr. Diehl, Dr. Abele also contacted legal counsel for advice about privileges in anesthesia.

The disarray in the Anesthesia Department came to the attention of the ob/gyn physicians who worked with the anesthesiologists. This was especially apparent in January, 1994, when Dr. Ron Larkin of defendant Cottonwood Obstetrics and Gynecology asked IHC legal counsel if he and the other physicians in his medical group were free to work only with the anesthesiologists who met the quality, service availability and patient satisfaction standards Cottonwood Ob/Gyn desired. Dr. Larkin testified that he was concerned about the addition of the plaintiffs to the labor and delivery schedule because he had worked with all three plaintiffs previously when they were on the labor and delivery schedule in the 1980's. Dr. Larkin stated that he "did not want them taking care of our patients" because the plaintiffs had not performed to his satisfaction in the past. Deposition of Dr. Ronald M. Larkin at 34 and 31–35. On February 4, 1994, the physicians at Cottonwood Ob/Gyn requested that another anesthesiologist be scheduled for their patients whenever Dr. Kaminsky was on call.

## E. The Agreement

Soon after Cottonwood Ob/Gyn's request regarding Dr. Kaminsky, Cottonwood Ob/

Gyn and defendant Dr. Matthews reached an agreement. The agreement obligated Dr. Matthews to personally provide anesthesiology services to Cottonwood Ob/Gyn's patients admitted to Cottonwood Hospital's labor and delivery room, or to select another physician of his choosing to perform such services. The contract was signed on February 7, 1994. It provided that Dr. Matthews "shall have exclusive authority and control over all anesthesia services provided to patients of Cottonwood obstetrics for labor, cesarean section and D & C's performed in the labor suite at Cottonwood Hospital."

Upon being advised of this agreement between Dr. Matthews and Cottonwood Ob/Gyn, Dr. Farley, as anesthesiology scheduler for the hospital, accommodated the new arrangement by scheduling an additional anesthesiologist to be on call whenever an anesthesiologist not approved by Dr. Matthews was on call in the labor and delivery room. Dr. Farley acquiesced to this demand to honor the ob/gyn physicians' requests.

After the agreement was made, Dr. Matthews informed Dr. Kaminsky that he would be double covered, meaning that when Dr. Kaminsky was on the labor and delivery schedule, there would be another anesthesiologist (as selected by Dr. Matthews) scheduled for the purpose of providing anesthesiology services to the patients of Cottonwood Ob/Gyn. Dr. Matthews offered Dr. Diehl and Dr. Diaz two non double-covered shifts a month with a possibility for increased work for Cottonwood Ob/Gyn's patients in the future if their ob/gyn skills were deemed acceptable. Dr. Diaz accepted this offer, but Dr. Diehl declined. A short time after performing under this procedure, the Cottonwood Ob/Gyn physicians informed Dr. Matthews that Dr. Diaz's performance was poor and unacceptable to them. Since the beginning of the Matthews/Cottonwood Ob/Gyn agreement, Drs. Kaminsky and Diehl have not requested positions on the labor and delivery schedule.

After Dr. Matthews and Cottonwood Ob/Gyn entered into their agreement, Dr. Matthews entered into a similar agreement with defendant Old Farm Ob/Gyn.

Because of the agreements between Dr. Matthews and the two physician groups, the plaintiffs contend they have been limited in their ability to utilize their obstetrical anesthesiology skills. Specifically, the plaintiffs argue that they are excluded from treating certain patients in Cottonwood Hospital's labor and delivery suite.

F.  The Suit

The plaintiffs brought suit under Section One of the Sherman Antitrust Act, alleging that the agreements between Dr. Matthews and Cottonwood Ob/Gyn and Old Farm Ob/Gyn and the conduct by the individual defendants constituted a combination that unreasonably restrained trade. The plaintiffs allege that individual defendants' conduct merits *per se* condemnation because the alleged conduct amounts to a horizontal group boycott involving a conspiracy between and among the three individual defendants. The plaintiffs contend that the only issue for a jury of this court to decide is whether the individual defendants actually conspired or combined to achieve this result. The plaintiffs acknowledge that their claim fails if the Rule of Reason applies to the agreements. The plaintiffs also bring pendant state claims under the Utah Antitrust Act with the same rationale as the Sherman Antitrust Act. The plaintiffs also state a claim for defamation based on Dr. Abele's alleged comments, and for tortious interference with economic relations based on the defendants' decisions regarding labor and delivery scheduling. The individual defendants now move for summary judgment on all the claims.

## DISCUSSION

### I.  Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

The party seeking summary judgment bears the initial burden of demonstrating

that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-moving party to establish the existence of an essential element to the claims on which they bear the burden of proof at trial. *Id.* To satisfy this burden, the non-moving party cannot rest on the pleadings, but must by affidavit or other appropriate means, set forth specific facts showing there is a genuine issue for trial. Fed. R.Civ.P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's case is insufficient; there must be evidence on which the jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making this determination, the court must examine the pleadings, affidavits and other evidence in the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

II. The Sherman Act Section One Claims

The individual defendants argue that they are entitled to summary judgment because their conduct as alleged by the plaintiffs and based on an undisputed factual record does not amount to a *per se* violation of the Sherman Act.

A. *Per Se* Versus Rule of Reason Analysis

The Sherman Act prohibits "every contract, combination ... or conspiracy, in restraint of trade or commerce ...." 15 U.S.C. § 1. "Whether an action violates § 1 of the Sherman Act depends on whether it is adjudged an *unreasonable* restraint." *Northwest Wholesale Stationers v. Pacific Station-*

*ery & Printing Co.,* 472 U.S. 284, 289, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985). The Supreme Court has developed two methods of analysis for determining whether a concerted action is an unreasonable restraint of trade:

> Ordinarily, whether particular concerted action violates § 1 of the Sherman Act is determined through case by case application of the so-called Rule of Reason—that is, "the fact finder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). Certain categories of agreements, however, have been held to be *per se* illegal, dispensing with the need for case-by-case evaluation. We have said that *per se* rules are appropriate only for "conduct that is manifestly anticompetitive," *id.,* at 50, 97 S.Ct., at 2557, that is, conduct " 'that would always or almost always tend to restrict competition and decrease output,' " *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284, 289–290, 105 S.Ct. 2613, 2617, 86 L.Ed.2d 202 (1985), quoting *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979).

*Business Elec. Corp. v. Sharp Elec. Corp.,* 485 U.S. 717, 723, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988).

The *per se* and the Rule of Reason analyses both examine whether the conduct alleged is an unreasonable restraint of trade, but the analyses carry different presumptions.[2] The application of the *per se* rule is reserved for situations where the conduct

---

2. *See,* John J. Flynn, *Rethinking Sherman Act Section 1 Analysis: Three Proposals for Reducing the Chaos,* 49 Antitrust Law Journal 1593, 1613 (1980) ("From the history of Sherman Act litigation, it is apparent that reliance upon a presumption of illegality is likely to arise where the facts induce a conclusion that joint action is directly displacing the competitive process or some central goal of the competitive process. The more central the goal being displaced, (price competition as the mechanism for establishing price and allocating resources) the more likely a presumption of illegality and the more conclusive the

presumption. The less clear the goals of antitrust policy involved or the more confused anticompetitive effects become with procompetitive effects as a result of the practice (vertical territorial restrains), the less conclusive the presumption allocating burdens of proof. Where no immediate impact on the goals of antitrust policy is perceived, no presumptions are created; and, a plaintiff must show under all the circumstances that there is a restraint which unreasonably displaces the competitive process as the rule of trade.")

almost always has an anticompetitive effect and virtually never has a procompetitive effect. If conduct falls into a *per se* category, the conduct is presumed illegal. For example, price-fixing, horizontal divisions of markets, bid rigging, tying arrangements, and horizontal refusals to deal have earned the *per se* label because experience has shown that these arrangements are almost always anticompetitive and rarely have any procompetitive justification. The *per se* analysis applies because the conduct is so certain to unreasonably displace the competitive process that it is presumed illegal.

■ On the other hand, the Rule of Reason presumes that the conduct is legal, but the plaintiff may show that under all the relevant factors, the alleged conduct is illegal because it has unreasonably displaced the competitive process. The Rule of Reason applies unless the plaintiffs demonstrate that the conduct falls into one of the *per se* categories.

■ Plaintiffs contend that *per se* treatment is appropriate for conduct of the individual defendants because their conduct constitutes a concerted horizontal refusal to deal. The plaintiffs argue that all horizontal group boycotts are *per se* illegal and that this court need only find that a horizontal agreement existed among the individual defendants in order to condemn it as *per se* illegal. *See, Klor's Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).

Plaintiffs' proposition overstates the applicable legal rule. Recent cases decided by the United States Supreme Court caution against the expansion of the "group boycott label" and the imposition of *per se* liability. *F.T.C. v. Indiana Fed'n. of Dentists,* 476 U.S. 447, 457–58, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) ("We have been slow . . . to extend *per se* analysis to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious . . . ."), *see also, State Oil Co. v. Khan,* —— U.S. ——, ——, 118 S.Ct. 275, 279, 139 L.Ed.2d 199 (1997) (overruling *per se* analysis for vertical maximum price fixing and expressing reluctance to impose *per se* rule). The Supreme Court has explicitly stated that unless the conspirators possess "market power or exclusive access to an element essential to effective competition, the conclusion that expulsion is virtually always likely to have an anticompetitive effect is not warranted." *Northwest Wholesale Stationers,* 472 U.S. at 296, 105 S.Ct. 2613. Finally, the Supreme Court has noted that in determining whether the *per se* rule applies, courts may look beyond the challenged conduct to the surrounding circumstances: "[T]here is often no bright line separating *per se* from Rule of Reason analysis. *Per se* rules may require considerable inquiry into market conditions before the evidence justifies a presumption of anticompetitive conduct." *N.C.A.A. v. Bd. of Regents of Univ. of Okl.,* 468 U.S. 85, 104 n. 26, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984).

The Eleventh Circuit recently addressed the applicability of the *per se* and Rule of Reason tests in a health care context and came to the following common sense rule:

> In sum, the *per se* rule requires a historically focused inquiry directed at ascertaining whether the behavior complained of is of the type that regularly poses anticompetitive consequences. Where prior cases have shown that a certain practice is of this type, a deleterious effect on the market will be presumed and no detailed market analysis is required. Where the anticompetitive effect of a practice is not historically clear, the practice may still be *per se* violative of antitrust laws if a preliminary examination of market conditions surrounding the alleged restraint at issue reveals such an impact absent any procompetitive justification.

*Retina Assoc. v. So. Baptist Hosp. of Florida,* 105 F.3d 1376, 1381 (11th Cir.1997). In *Retina,* the plaintiff was a corporation of retinal ophthalmologists who alleged that the defendant hospital and individual ophthalmologists engaged in a concerted refusal to deal with the plaintiff. The defendants had formed a center for ophthalmological services with several non-specialized ophthalmologists, a few retina specialists, and a major local hospital. After the defendants had formed this center, the non-specialized ophthalmologists who had joined the center

discontinued referring their cases to the plaintiffs and instead referred them to the retina specialist located in the center. *Id.* at 1379–80. The plaintiffs argued that the situation merited *per se* treatment because the conduct was a horizontal group boycott. The Eleventh Circuit disagreed and found that the boycott alleged did not merit *per se* treatment because it was not the type of behavior that had been historically shown to adversely affect competition. *Id.* at 1381. The court found that it was not unusual for a multi-provider network such as the one formed by the defendants to affiliate with only one specialist group. Furthermore, the court found that the anticompetitive effect was not "immediately obvious." *Id.* at 1382. The court further noted that the anticompetitive effect of defendants' alleged refusal to refer patients to the plaintiffs was not fully understood and therefore should not be condemned out of hand by the *per se* rule. *Id.*

This court finds the recent pronouncements of the United States Supreme Court and the Eleventh Circuit's opinion instructive. This court is also faced with an allegation of a *per se* violation in circumstances that do not appear to reflect the concerns of *per se* treatment in traditional horizontal boycott cases. Although the present situation is different than the circumstances in *Retina,* the same reasoning applies. This court finds that *per se* treatment of any agreement between Dr. Matthews and the other individual defendants is inappropriate for three reasons: 1) The boycott alleged here is not the type that has been historically shown to always or almost always negatively affect competition; 2) a preliminary examination of market conditions does not reveal any anticompetitive impact; and 3) the defendants have offered procompetitive justifications for their actions.

### 1. The Historic *Per Se* Boycotts

A United States Supreme Court opinion frequently cited to explain and support a *per se* analysis for an alleged group boycott is *Klor's Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). In *Klor's,* the plaintiff San Francisco appliance store claimed that the defendant prohibited ten national appliance manufactur-

ers and distributors from selling appliances to the plaintiff. The defendants did not deny or offer any justifications for their actions, but argued that there had been no effect on competition. *Id.* at 209, 79 S.Ct. 705. The district court granted summary judgment in favor of the defendants finding that the injury was not the "public wrong" that the antitrust laws had been enacted to protect. The Court of Appeals affirmed this decision. The Supreme Court found that the plaintiffs had alleged enough to maintain a cause of action under the antitrust laws because "[g]roup boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category." *Id.* at 212, 79 S.Ct. 705. The Court found there were sufficient allegations in the complaint to support a boycott proscribed by the antitrust laws:

> This combination takes from Klor's its freedom to buy appliances in an open competitive market and drives it out of business as a dealer in the defendants' products. It deprives the manufacturers and distributors of their freedom to sell to Klor's at the same prices and conditions made available to Broadway–Hale and in some instances forbids them from selling to it on any terms whatsoever. It interferes with the natural flow of interstate commerce. It clearly has, by its "nature" and "character," a "monopolistic tendency."

*Id.* at 213, 79 S.Ct. 705. The Court found that the plaintiff was entitled to prove its case of conspiracy and remanded the case to the District Court for trial.

More recently, in a case relied on by the plaintiffs, the Court held that a group boycott fell into the *per se* category. In *F.T.C. v. Superior Court Trial Lawyer's Ass'n,* 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851, (1990), the Court found that the *per se* rule applied when the defendant organization staged a boycott for the purposes of raising the prices of court-appointed counsel for indigent defendants. The Court disregarded the defendant's claims that the boycott was justified because it was in the public's interest to obtain better legal representation. The Court held that the boycott had the anticom-

petitive effect the antitrust laws were intended to protect against. *Id.* at 424, 110 S.Ct. 768. The Court described the situation:

> Prior to the boycott CJA lawyers were in competition with one another, each deciding independently whether and how often to offer to provide services to the District at CJA rates. The agreement among the CJA lawyers was designed to obtain higher prices for their services and was implemented by a concerted refusal to serve an important customer in the market for legal services, and indeed, the only customer in the market for the particular services that CJA regulars offered.

*Id.* at 422–423, 110 S.Ct. 768. The Court also found that the "undenied objective of their boycott was an economic advantage for those who agreed to participate." *Id.* at 426, 110 S.Ct. 768. The Court therefore found that despite the defendants' justifications, the boycott was "unquestionably a 'naked restraint' on price and output" and condemned it as *per se* illegal. *Id.* at 423, 110 S.Ct. 768.

The boycott cases that have merited *per se* review in the past deal with markets that were open and competitive until the concerted action closed off part of the market. *Klor's*, 359 U.S. at 213, 79 S.Ct. 705. *See also, United States v. Topco Assoc., Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972) (food cooperative divided markets among its members); *United States v. Gen. Motors*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1965) (General Motors prohibited its dealers from selling through discounters); *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961) (gas association refused to approve defendant's product resulting in inability to supply gas for product); *Silver v. New York Stock Exch.*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963) (stock exchange refused to provide information access to non-members); *Associated Press v. United States Tribune*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1944) (newspaper group denied information and membership to non-member newspapers). In other words, *per se* review was required when the defendants' joint action by its very nature unreasonably displaced the competitive process. The cases also demonstrate that *per se* analysis is appropriate when the boycott's only apparent purpose is to facilitate collusion. *F.T.C. v. Superior Court Trial Lawyer's Ass'n.*, 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990). On the other hand, the Supreme Court has refused to apply the *per se* rule in a wide variety of settings where the Court could not determine whether the action displaced the competitive process. *F.T.C. v. Indiana Fed'n. of Dentists*, 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) (dentists withheld x-rays from insurance companies); *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985) (expulsion of member from cooperative buying arrangement); *N.C.A.A. v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) (limiting number of televised college football games to NCAA members). *See also, All Care Nursing Service, Inc. v. High Tech Staffing Serv., Inc.*, 135 F.3d 740 (11th Cir.1998) (holding that preferred provider program was not *per se* illegal group boycott of non preferred agencies); *Betkerur v. Aultman Hosp. Ass'n.*, 78 F.3d 1079 (6th Cir.1996) (holding that decision of ob/gyn's to refer to plaintiff's neonatologist competitor did not merit *per se* review); *Balaklaw v. Lovell*, 14 F.3d 793 (2d Cir.1994) (holding that exclusive contract between hospital and anesthesiologist group should not be considered *per se* illegal and confer standing on plaintiff); *BCB Anesthesia Care v. Passavant Mem'l. Hosp.*, 36 F.3d 664 (7th Cir.1994) (declining to apply *per se* rule to hospital staffing decision); *Bhan v. NME Hospitals, Inc.*, 929 F.2d 1404 (9th Cir.1991) (holding that agreement between physicians and hospital to allow only physicians to offer services in particular area was not *per se* violation).

The present situation is quite different from the Supreme Court cases meriting *per se* review. The structure of the anesthesia system at Cottonwood Hospital before 1994 as presented in the instant case is not the type of open or competitive market contemplated and sought to be protected by *per se* application of the Sherman Act. One staff anesthesiologist was scheduled for each 24 hour shift in the ob/gyn rotation. The anes-

thesiologist on call was not chosen by the ob/gyn physicians or the ob/gyn patients. The only requirements for the anesthesiologist to be placed in the call rotation was that the anesthesiologist possess staff privileges at Cottonwood Hospital and be scheduled by the Anesthesiology Department's scheduler.

Such a system was not driven by price or consumer choice. Unlike the situation where a patient chooses an ob/gyn physician by shopping around for the best doctor, the ob/gyn doctor or patient had no realistic choice but to use the anesthesiologist on call when an obstetric case presented itself.[3] The ob/gyn doctor's lack of choice was limited by a number of logistic and economic factors. The ob/gyn must deliver babies or perform surgeries at a hospital, usually whenever the baby in question chooses to be delivered, and there was great pressure for a doctor practicing at the hospital to use the system in place. It would be logistically difficult for an ob/gyn to use the anesthesiologist of his or her choice every time the ob/gyn had a case come in or whenever the ob/gyn had some reservations about the anesthesiologist on call. Furthermore, it would likely be too expensive for ob/gyn patients to pay for the services of an anesthesiologist that would work solely for one ob/gyn doctor.

The "on call" system appears to have been established to address basic quality and staffing concerns. The hospital used the call system to make sure it approves of the doctors who perform anesthesia there through its privileging system. The call system also insures the availability of an anesthesiologist to assist the hospital's patients.

The agreement between Dr. Matthews and Cottonwood Ob/Gyn changed the call system somewhat, giving certain ob/gyn physicians a choice of anesthesiologist. The agreement allowed the Cottonwood Ob/Gyn physicians to designate which anesthesiologists they desired to work with. In this respect, the agreement may not have disrupted, but rather supplemented, the call system, as well as

competition. No anesthesiologist lost a position on the call roster. The agreement also overcame the logistic and economic problems that prevented ob/gyn physicians from arranging for their own anesthesiologists. The agreement simply designated an agent who would organize the anesthesiologists of choice to cover all shifts. Finally, the agreement maintained the quality assurances built in by the privileging process.

The agreement between Dr. Matthews and Cottonwood Ob/Gyn is unlike any where boycotts have traditionally been accorded *per se* treatment. The call system is entirely different from appliance distributors who sell to a national market, or a defense attorney program that can hire any licensed attorney in the District of Columbia. In the cases that have merited *per se* treatment, the consumer or distributor had a great deal of choice on where to buy or with whom to distribute until the horizontal agreement among the defendants in those cases prevented or severely hampered that choice. In those cases, the defendants' joint action more clearly unreasonably displaced the competitive process. The Matthews' agreement is also unlike the cases where boycotts were accorded *per se* treatment because the agreement did not serve to increase the price of the anesthesiologist's services.

Furthermore, this case deals with a call system that appears to be common throughout the health care industry. The unique nature of the call system and the relative inexperience [4] of the courts in understanding and regulating internal hospital scheduling practices make it wholly inappropriate to justify condemning one type of scheduling practice as *per se* violative of the Sherman Act. The United States Supreme Court has cautioned that "It is only after considerable experience with certain business relationships that courts classify them as *per se* violations." *Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.,* 441 U.S. 1, 9, 99 S.Ct.

---

3. Plaintiffs acknowledge that this was the situation: "Prior to February 1994, Cottonwood OB-GYN had used whichever anesthesiologist was on the OB schedule." Plaintiffs' Memorandum in Opposition at xxvii, ¶ 78.

4. This court could only find one case that addressed on call scheduling in an antitrust context. The district court there applied the Rule of Reason. *Anesthesia Advantage, Inc. v. The Metz Group,* 759 F.Supp. 638 (D.Colo.1991).

1551, 60 L.Ed.2d 1 (1979). It may be that this type of scheduling practice actually involved a combination or concerted action by the defendants and that it is anticompetitive, but such a conclusion should only be reached after an analysis of all relevant factors under the Rule of Reason. In sum, defendants' alleged practice is not the type that regularly poses anticompetitive consequences. Consequently, *per se* analysis is not appropriate.

### 2. A Preliminary Examination of the Market

The court's inquiry does not end with the historical analysis. Other factors may require *per se* review. The Supreme Court has stated that *per se* treatment may be merited where the plaintiffs have shown that the defendants hold "market power or unique access to a business element necessary for effective competition." *Northwest Wholesale Stationers,* 472 U.S. at 298, 105 S.Ct. 2613. As the Eleventh Circuit noted, "the practice may still be *per se* violative of antitrust laws if a preliminary examination of market conditions surrounding the alleged restraint at issue reveals such an impact absent any procompetitive justification." *Retina Assoc.,* 105 F.3d at 1381. While not mandated, a preliminary examination of market conditions is acceptable under a *per se* analysis. *See, N.C.A.A. v. Bd. of Regents of Univ. of Okl.,* 468 U.S. 85, 104 n. 26, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) ("[T]here is often no bright line separating *per se* from Rule of Reason analysis. *Per se* rules may require considerable inquiry into market conditions before the evidence justifies a presumption of anticompetitive conduct.")

In this case, the plaintiffs have not alleged market power on the part of the defendants. Indeed, the plaintiffs have not defined any relevant market. Accordingly, the court has no basis on which to determine the size of Cottonwood Ob/Gyn's and Old Farm Ob/Gyn's practices at Cottonwood Hospital compared to other ob/gyn groups or how significantly the agreement between Dr. Matthews and Cottonwood Ob/Gyn and Old Farm Ob/Gyn affects the plaintiffs' or other anesthesiologists' ability to practice ob/gyn anesthesia at Cottonwood Hospital or any other relevant geographic market.

In this connection, the plaintiffs also fail to allege or demonstrate that the defendants hold unique access to a business element necessary for effective competition. Again there is no evidence as to the relative size of Cottonwood Ob/Gyn's and Old Farm Ob/Gyn's practices at Cottonwood Hospital, the percentage of plaintiffs' anesthesiology work performed at Cottonwood Hospital, or any of the other factors relative to market power or unique access.

Because the plaintiffs have failed to show the defendants hold market power or unique access to a business element necessary for effective competition, plaintiffs' claim does not merit *per se* review based on market conditions.

### 3. Defendants' Procompetitive Justifications

Even if the plaintiffs had presented evidence to meet the threshold showing necessary for *per se* treatment, the defendants offer several procompetitive justifications for the agreement. The first is that the agreement actually enhances competition by creating a choice for the purchaser of anesthesia services. The agreement enables the patient or ob/gyn doctor performing a procedure to choose which anesthesiologist he or she will use rather than requiring the doctor to use whichever anesthesiologist happens to be on call.

The second justification offered by the defendants is the unique nature of the health care industry. While the health care industry is not awarded any special treatment under the antitrust laws, the nature of the industry is a consideration in determining whether a *per se* violation has occurred. As discussed previously in Section II.A.1, the unique nature of this industry is a persuasive factor for applying the Rule of Reason.

The third justification the defendants offer is that they were legitimately concerned about the level of the plaintiffs ob/gyn anesthesia skills. The defendants cite several cases that acknowledge that excluding doctors on the basis of professional competence does not violate the antitrust laws. Defen-

dant Matthews' Memorandum in Support of Summary Judgment at 17.[5] Although most of the cases the defendants cite discuss the peer review process, a procedure not at issue in this case, the reasoning carries some weight in this context. Plaintiffs vigorously dispute that defendants are concerned about the plaintiffs' professional competency. Plaintiffs contend that defendants only seek to protect their clientele bases. This court cannot determine which desire primarily motivated the agreement between Matthews and Cottonwood Ob/Gyn. However, this court is not prepared to hold that it is a *per se* violation of the antitrust laws when ob/gyn physicians allegedly decline to work with certain anesthesiologists based at least in part on professional competency issues. The issue of professional competency is yet another factor that a jury should be allowed to hear in deciding whether the agreement was primarily motivated by anticompetitive illegal intent or legitimate concerns.

### B. The Plaintiff's Argument

██ The plaintiffs contend that Tenth Circuit law as expressed in *Tarabishi v. McAlester Hospital,* 951 F.2d 1558 (10th Cir.1991), mandates the application of a *per se* analysis.[6] In *Tarabishi,* the plaintiff was an ear, nose and throat physician who practiced at the defendant hospital. The plaintiff left the hospital's clinic to start his own practice, but retained privileges at the hospital. After the plaintiff had established a successful practice, the plaintiff began planning an outpatient surgical clinic. *Id.* at 1561. At first, the hospital did not have a response to plaintiff's plans. After a short time, however, the hospital decided to build its own outpatient surgical center and it began opposing the plaintiff's efforts to build his center. During this same time frame, the hospital initiated an investigation into alleged improper and inap-

propriate behavior by the plaintiff. This investigation resulted in the hospital's revoking the plaintiff's surgical and emergency room privileges. *Id.* at 1562.

Both outpatient centers eventually opened, but the plaintiff's center folded within a year. The plaintiff argued that the hospital's revocation of his privileges made it impossible for his clinic to be successful because he needed to have access to the hospital's emergency care facilities. The hospital contended that the center failed because the economic structure of the clinic was flawed from the beginning. *Id.* at 1562–63.

The plaintiff sued the hospital, charging, among other things, that the defendants had conspired to boycott him and to stabilize prices. The plaintiff argued that *per se* analysis should apply, but the district court found the Rule of Reason was more appropriate. The Tenth Circuit upheld the district court's determination, stating: "Denying staff privileges to a physician through peer review on the basis that the physician's conduct is unprofessional and inappropriate is not an activity 'likely to have predominately anticompetitive effects' such that *per se* treatment is necessary." *Id.* at 1571. The plaintiffs contend *Tarabishi* stands for the proposition that "[t]he Tenth Circuit in effect held conversely, that in the absence of a lack of professional competence or unprofessional conduct, the defendants' actions conduct would be judged by a *per se* analysis." Plaintiffs' Memorandum in Opposition to Summary Judgment at 5.

While it may be true that the defendants' alleged concern about the quality of the plaintiffs' anesthesiology services did not involve peer review proceedings, their concerns at least appear to raise genuine issues of material fact that are relevant to a full rule of reason analysis. Furthermore, while

---

5. The defendants cite to the following cases: *Tarabishi v. McAlester Reg. Hosp.,* 951 F.2d 1558, 1570 n. 18 (10th Cir.1991); *Weiss v. York Hosp.,* 745 F.2d 786, n. 60 (3rd Cir.1984); *Cogan v. Harford Memorial Hosp.,* 843 F.Supp. 1013, 1019 (D.Md.1994); *Pontius v. Children's Hosp.,* 552 F.Supp. 1352, 1369–70 (W.D.Pa.1982).

6. The plaintiffs also cite *Brown v. Presbyterian Healthcare Services,* 101 F.3d 1324 (10th Cir.

1996), and *Coffey v. Healthtrust,* 955 F.2d 1388 (10th Cir.1992) as requiring a *per se* analysis. However, these two cases are largely irrelevant, and generally unhelpful, to the issue before the court. *Brown* does not discuss whether the court applied the *per se* or Rule of Reason analysis. *Coffey* is limited to the issue of conspiracy or combined action.

plaintiffs make much of the fact that they have not been the subject of any official disciplinary proceedings, they fail to acknowledge that their ability to practice anesthesia, and even ob/gyn anesthesia, has not been hampered by the defendants' actions except with regard to the patients of two groups of ob/gyn practitioners at one local hospital. The plaintiffs may still be scheduled on the labor and delivery rotation and in other areas of the hospital their privileges have not been limited. This court is aware of no provision in the antitrust laws of this country that mandates on-call rotations at a given hospital for anesthesiologists, without first subjecting such an inquiry to a Rule of Reason analysis.

Based on the historical inquiry, the limited review of the market and surrounding circumstances, and the applicable case law, this court finds that the defendants' joint action should be reviewed under the Rule of Reason. Because the plaintiffs have conceded that they cannot support their case under the Rule of Reason, the plaintiffs' Sherman Antitrust Act claim is dismissed against defendants Matthews, Farley, and Abele. The Utah Antitrust claims are also dismissed for the same reasons because the Utah Antitrust statute follows the same analysis as the federal statute.

### III. The Defamation and Tortious Interference with Economic Relations Claims

██ Defendants also move for summary judgment on plaintiffs' defamation and tortious interference with economic relations claims. Under 28 U.S.C. § 1367(c)(3) this court may decline to exercise supplemental jurisdiction when it has "dismissed all claims over which it has original jurisdiction." The court has dismissed all of plaintiffs' claims over which it has original jurisdiction by dismissing plaintiffs' Sherman Act claims. The only remaining claims are plaintiffs' pendant state law defamation and tortious interference with economic relations claims. Because these claims deal solely with state law, they are better left to the jurisdiction of the state courts. Therefore, the court declines to exercise supplemental jurisdiction over these claims. These claims are dismissed without prejudice.

### IV. Summary and Conclusion

For the reasons set forth, this court finds that the Rule of Reason must be applied to defendants' alleged agreement. Because the plaintiffs have conceded that their claim fails under the Rule of Reason, plaintiffs first and second causes of action are DISMISSED with prejudice and Defendants' motion for summary judgment is GRANTED on plaintiffs' first and second claims. Because this court declines to exercise supplemental jurisdiction over the defamation and tortious interference with economic relations claims, the defendants' motion for summary judgment with respect to those claims is DENIED and those claims are DISMISSED without prejudice.