**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 27 2000**

**PATRICK FISHER**
**Clerk**

<u>PUBLISH</u>

### UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

---

ANTHONY DIAZ, PAUL DIEHL and
ALLAN KAMINSKY,

      Plaintiffs-Appellants,

v.

MICHAEL FARLEY, MORRIS
MATTHEWS, JOAN ABELE,
COTTONWOOD OBSTETRICS &
GYNECOLOGY & INFERTILITY,
OLD FARM OBSTETRICS &
GYNECOLOGY, and JOHN DOES I-
X,

      Defendants-Appellees.

No. 98-4136

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 94-CV-1184-B)**

---

Jay D. Gurmankin (Eliot M. Cohen and Chris R. Hogle with him on the briefs),
Berman, Gaufin, Tomsic, Savage & Campbell, Salt Lake City, Utah, for
Plaintiffs-Appellants.

George A. Hunt, Williams & Hunt, Salt Lake City, Utah and Randy T. Austin,
Kirton & McConkie, Salt Lake City, Utah (R. Stephen Marshall, Durham, Jones &
Pinegar, Salt Lake City, Utah; Kenneth W. Yeates, Van Cott, Bagley, Cornwall &
McCarthy; R. Brent Stephens, Snow, Christensen & Martineau, Salt Lake City,
Utah, with them on the brief) for Defendants-Appellees.

Before **TACHA, BRORBY** and **EBEL**, Circuit Judges.

**EBEL**, Circuit Judge.

Drs. Diaz, Diehl, and Kaminsky (collectively, the "plaintiffs") are anesthesiologists with privileges at Cottonwood Hospital in Murray, Utah. They brought an antitrust suit against three other anesthesiologists with privileges at Cottonwood, Drs. Farley, Matthews, and Abele (collectively, the "individual defendants"), and against two entities, Cottonwood Obstetrics & Gynecology & Infertility ("Cottonwood Ob/Gyn") and Old Farm Obstetrics & Gynecology ("Old Farm Ob/Gyn"). The plaintiffs alleged that the individual defendants engaged in a horizontal group boycott that violated Section 1 of the Sherman Act and the Utah Antitrust Act. They further alleged that Cottonwood Ob/Gyn and Old Farm Ob/Gyn also violated Section 1 of the Sherman Act and the Utah Antitrust Act when they horizontally agreed to honor the boycott engineered by the individual defendants. The plaintiffs also sued all of the defendants for tortious interference with economic relations, and they sued one of the individual defendants, Dr. Abele, for defamation.

The plaintiffs maintain that the actions of the defendants were *per se* unlawful under the antitrust laws, and they have conceded that they could not

prove their claims if the rule of reason governs the conduct at issue. The district

court found that the rule of reason applies to the actions of the defendants;

therefore it granted the individual defendants' motion for summary judgment on

the antitrust claims, and dismissed with prejudice the plaintiffs' antitrust claims

against all of the defendants.[1] The district court then dismissed without prejudice

the pendant defamation and tortious interference with economic relations claims.

The plaintiffs now appeal, and we affirm.

## I. BACKGROUND[2]

### A. Cottonwood Hospital and the Anesthesia Department

Cottonwood Hospital is located in Murray, Utah, just south of Salt Lake

City. The hospital is governed pursuant to bylaws recommended by the

Cottonwood Hospital medical staff and adopted by the Cottonwood Hospital

---

[1] It was unclear whether the district court's July 17, 1998 Memorandum Decision disposed of all of the claims against all of the defendants, or just the claims against the individual defendants. On June 12, 2000, the district court filed a Supplemental Order clarifying that its Memorandum Decision was and is a final judgment dismissing all of the plaintiffs' claims against all of the defendants. The district court also filed a Judgment pursuant to Federal Rule of Civil Procedure 58.

[2] The majority of the facts in this case are undisputed and are adopted from the district court's thorough opinion. See Diaz v. Farley, 15 F. Supp.2d 1138 (D. Utah 1998). To the extent that any facts are disputed, we have viewed them in the light most favorable to the plaintiffs, because this appeal stems from the grant of a motion for summary judgment in favor of the defendants. See Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996).

- 3 -

Board of Trustees. The bylaws establish separate departments within Cottonwood Hospital, including a Department of Anesthesiology. Anesthesiology services at Cottonwood Hospital are provided by the members of the Department of Anesthesiology ("Department"), all of whom are licensed anesthesiologists who practice medicine independently of each other. The anesthesiologists are not considered employees of the hospital. The Department schedules anesthesiologists to cover the operating room ("OR"), the labor and delivery room, and other areas of the hospital. Each area requires a specific number of anesthesiologists each day. Historically, anesthesiologists working in one area have not been regularly scheduled in another area. The OR and labor and delivery divisions have each had a certain number of "slots," or physicians, who rotate in the schedule. A new physician is usually only added to the rotation in these areas when another physician leaves.

Until November, 1993, two anesthesiologists from the Department were responsible for scheduling anesthesiology services at Cottonwood. In November, 1993, a single anesthesiologist, Dr. Farley, became the monthly scheduler. He was selected as scheduler by a two-thirds majority vote of the voting members of the Department. As the scheduler, Dr. Farley was responsible for ensuring that a sufficient number of anesthesiologists were assigned to cover each area of the

hospital at all times. Prior to February, 1994, a single department member was assigned to cover each 24-hour labor and delivery shift.

B. Plaintiffs-Appellants

Plaintiff-appellant Dr. Anthony Diaz practiced general anesthesiology at Cottonwood, including obstetric ("ob/gyn") anesthesiology between 1981 and 1982. He left Cottonwood in 1982 to practice medicine elsewhere and then returned to Cottonwood in 1990. From 1990 to 1992, Dr. Diaz did some "fill in" anesthesiology work on the labor and delivery schedule at the rate of approximately two shifts per month. In 1993, he requested significant additional labor and delivery shifts.

Plaintiff-appellant Dr. Paul Diehl practiced anesthesia in labor and delivery at Cottonwood between 1981 and 1989. In 1989, Dr. Diehl left the labor and delivery anesthesia practice to work in the OR anesthesia practice.[3] In 1992 and 1993, Dr. Diehl again sought significant work in labor and delivery.

Plaintiff-appellant Dr. Kaminsky practiced anesthesiology in labor and delivery at Cottonwood between 1980 and 1983. In 1983, Dr. Kaminsky gave up

_____

[3] There is some uncertainty in the record whether Dr. Diehl left the labor and delivery anesthesia practice in 1985 or 1989. We use the 1989 date because that appears consistent with his deposition testimony, but if that fact is in dispute, it is not determinative of our holding.

his labor and delivery shifts for shifts in the OR division. In 1993, Dr. Kaminsky asked to be included again in the labor and delivery schedule.

Thus, plaintiffs Drs. Diaz, Diehl, and Kaminsky each performed anesthesiology services in the labor and delivery room at Cottonwood Hospital for a period of time in the 1980s; each voluntarily ceased performing such services in the labor and delivery room; and each sought to regain a significant number of shifts on the labor and delivery schedule in 1993.

C. Defendants-Appellees

Defendant-appellee Dr. Michael Farley has been a member of Cottonwood's Department of Anesthesiology since 1986; defendant-appellee Dr. Morris Matthews has been a member since 1983; and defendant-appellee Dr. Joan Abele was a member from 1983 to 1996. All three individual defendants were part of a five-physician rotation that regularly performed anesthesiology in labor and delivery for several years prior to 1993. Defendants-appellees Cottonwood Ob/Gyn and Old Farm Ob/Gyn are practice groups comprised of gynecologists and obstetricians with privileges to practice at Cottonwood Hospital.

D.  Scheduling Dispute

In November, 1993, Dr. Diaz, who was the acting Anesthesia Department Chairman, called a Department meeting to discuss the scheduling of ob/gyn anesthesia.  At that time, there was apparently only one open slot in the labor and delivery rotation and Drs. Diaz, Diehl, and Kaminsky were all seeking increased labor and delivery shifts.  The Department members concluded that the plaintiffs would be scheduled for "some" labor and delivery shifts.

In December, 1993, the Department members met again to discuss whether the plaintiffs should be given new "slots" so that everyone would work equally on the labor and delivery schedule, or whether they would be given one slot to share among the three of them.  The Department members apparently decided that the ob/gyn anesthesiologists currently filling the "slots" would meet separately to discuss the issue.  It is unclear whether that meeting ever took place.  The plaintiffs continued to work to some extent in labor and delivery, but there was no definite resolution of the scheduling issue.

The individual defendants' hesitations about granting plaintiffs' requests to return to the labor and delivery rotation apparently stemmed from the following: concern over the plaintiffs' absence from ob/gyn anesthesia, possible disruption of the smoothly running ob/gyn anesthesia schedule, and a decrease in the

individual defendants' own total number of shifts with ob/gyn patients. At around

this time, individual defendant Dr. Matthews wrote the following in his journal:

> Three people who had all left OB in the past now are asking to come
> back on. There is one slot open, and another fellow in the OR wants
> to do more OB. The OR people what [sic] us to equally divide the
> shifts, but those of us who never left don't want that. In addition
> some of the OB's don't want one of them to come back. Since he
> quit doing OB when I cam [sic] 10 years ago, I wonder how good his
> memory is, but I think we'll have to let him work some shifts and let
> him remember why he gladly left a decade ago. We have some
> problems in the department. About half of the people are easy to get
> along with and all the surgeons will work with them. The others
> have personality quirks or are slow, and some surgeons request not to
> have them.

Shortly thereafter, Dr. Matthews sent Dr. Farley a letter, informing him that a

proposed contract being considered with Cottonwood Ob/Gyn would impact the

monthly anesthesia schedule. At around the same time, Dr. Abele circulated an

unauthorized informal "poll" to the Obstetrics Department at Cottonwood

Hospital, asking OB practitioners to rate anesthesiologists, including Drs. Diaz,

Diehl, and Kaminsky.

Dr. Ron Larkin, the managing partner of Cottonwood Ob/Gyn, testified that

he had concerns about the addition of the plaintiffs to the labor and delivery

schedule based on prior experiences with all three plaintiffs. Dr. Larkin stated

that he "did not want them taking care of our patients" because of those concerns.

On February 4, 1994, the physicians at Cottonwood Ob/Gyn requested that

another anesthesiologist be scheduled for their patients whenever Plaintiff Dr. Kaminsky was on call.

E.  The Agreement Between Dr. Matthews and Cottonwood Ob/Gyn

Soon after Cottonwood Ob/Gyn's request regarding Dr. Kaminsky, Cottonwood Ob/Gyn and individual defendant Dr. Matthews reached an agreement.  The agreement obligated Dr. Matthews personally to provide anesthesiology services to Cottonwood Ob/Gyn's patients in the labor and delivery room, or to select another physician of his choosing to perform such services.  The contract, which was signed on February 7, 1994, provided that Dr. Matthews "shall have exclusive authority and control over all anesthesia services provided to patients of Cottonwood obstetrics for labor, cesarean section and D & Cs performed in the labor suite at Cottonwood Hospital."  Thus, according to the agreement, either Dr. Matthews or an anesthesiologist selected by him would provide anesthesiology services for Cottonwood Ob/Gyn patients in labor and delivery.

F.  Double Coverage of Plaintiffs' Shifts at Cottonwood Hospital

After the agreement was made, Dr. Matthews informed Dr. Kaminsky that he would be "double covered," meaning that whenever Dr. Kaminsky was on the

labor and delivery schedule, there would also be another anesthesiologist (selected by Dr. Matthews) scheduled. The anesthesiologist selected by Dr. Matthews would be the one who would provide anesthesiology services to the patients of Cottonwood Ob/Gyn in labor and delivery.[4] Dr. Matthews offered Drs. Diehl and Diaz two non-double covered shifts per month, with the possibility for increased work for Cottonwood Ob/Gyn patients in the future if their ob/gyn skills were deemed acceptable. Dr. Diaz accepted this offer, but Dr. Diehl declined and was then subject to being double covered. Subsequently, Cottonwood Ob/Gyn requested that Dr. Diaz not perform anesthesia on its obstetrical patients because of poor performance; therefore, Dr. Diaz was ultimately double covered as well. The double coverage policy operated to preclude the plaintiffs from performing anesthesia services on Cottonwood Ob/Gyn patients in the labor and delivery suite. Whenever they were scheduled in labor and delivery, Dr. Matthews or an anesthesiologist selected by him was scheduled as well. The other anesthesiologist performed the anesthesiology services for the Cottonwood Ob/Gyn patients in labor and delivery.

Plaintiffs were also ultimately double covered for Cottonwood Ob/Gyn patients seen in the OR after physicians in the OR indicated that they would

---

[4] This still allowed Doctor Kaminsky to provide anesthesiology services to ob/gyn patients admitted to Cottonwood Hospital who were not from Cottonwood Ob/Gyn.

prefer not to be scheduled with them.  In addition, the plaintiffs allege that the effects of the agreement and the double coverage policy have been extended as Dr. Matthews has asked other groups of obstetricians and gynecologists who deliver babies at Cottonwood to enter into agreements similar to the one he had with Cottonwood Ob/Gyn.

On March 7, 1994, Dr. Matthews sent a letter to Dr. Alan Rappeleye of Old Farm Ob/Gyn in an attempt to solicit Old Farm Ob/Gyn to enter into an agreement similar to the agreement he had with Cottonwood Ob/Gyn.  On June 8, 1994, Old Farm Ob/Gyn sent a letter to Cottonwood Ob/Gyn indicating that Old Farm Ob/Gyn would abide by the Cottonwood Ob/Gyn agreement.  Plaintiffs allege that the June 8th letter serves as evidence of a horizontal agreement between Old Farm Ob/Gyn and Cottonwood Ob/Gyn to boycott plaintiffs.

H.  Procedural History

The plaintiffs sued under Section 1 of the Sherman Act, 15 U.S.C. § 1 (1990),[5] alleging that the defendants engaged in a conspiracy that unreasonably restrained trade.  They argued that the conduct at issue amounted to a horizontal

---

[5] 15 U.S.C. § 1 provides in relevant part:  "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal."

group boycott that merited *per se* condemnation under the antitrust laws. They conceded to the district court that they did not have sufficient evidence to proceed under a theory that the alleged conduct violated the rule of reason.

The district court granted the individual defendants' motion for summary judgment and dismissed the plaintiffs' antitrust claims against all of the defendants after finding that *per se* treatment was inappropriate for three reasons: (1) the boycott alleged by the plaintiffs was not the type that has been historically shown to always or almost always negatively affect competition; (2) a preliminary examination of market conditions did not reveal any anticompetitive impact; and (3) the defendants offered procompetitive justifications for their actions. The district court then declined to exercise supplemental jurisdiction over plaintiffs' defamation and tortious interference with economic relations claims pursuant to 28 U.S.C. § 1367, and dismissed those claims without prejudice. Plaintiffs do not appeal that dismissal.

In this appeal, plaintiffs allege that the district court relied on an inaccurate and inconsistent characterization of the facts, and they maintain that the *per se* rule applies to the conduct of the defendants.

## II. DISCUSSION

The district court had original jurisdiction over the antitrust claims pursuant to 28 U.S.C. § 1337[6] and 15 U.S.C. § 15.[7] We have jurisdiction under 28 U.S.C. § 1291.

We review de novo a district court's order granting summary judgment. See Kaul, 83 F.3d at 1212.

> Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. When applying this standard, we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. If there is no genuine issue of material fact in dispute, then we next determine if the substantive law was correctly applied by the district court.

Id.

---

[6] 28 U.S.C. § 1337 provides in relevant part:
(a) The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies.

[7] 15 U.S.C. § 15 provides in relevant part:
Except as provided in subsection (b) of this section [regarding foreign states], any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

A.  The District Court's Characterization of the Facts

Plaintiffs first contend that the district court relied on an inaccurate and internally inconsistent characterization of the facts in reaching its decision.  They argue that the district court placed too much emphasis on the agreement between Dr. Matthews and Cottonwood Ob/Gyn, and ignored other evidence of conversations and agreements involving the defendants.  Although the district court did not specifically mention the substance of every relevant conversation in which the defendants engaged in the months leading up to the agreement between Dr. Matthews and Cottonwood Ob/Gyn, the district court did discuss several meetings and conversations involving the defendants that preceded the Matthews/Cottonwood Ob/Gyn agreement.  Plaintiffs have failed to show how any of the evidence they cite that was not mentioned in the district court opinion would alter the horizontal group boycott analysis.[8]

---

[8] Plaintiffs point specifically to the district court's failure to mention an agreement between Drs. Farley and Matthews that Dr. Farley would make the labor and delivery schedule in accordance with Dr. Matthews' decisions.  In acting in accordance with Dr. Matthews' decisions when developing the schedule, Dr. Farley was simply abiding by the agreement between Dr. Matthews and Cottonwood Ob/Gyn and carrying out his duties as the scheduler.  Thus, the district court did not "ignore" the agreement between Dr. Matthews and Dr. Farley; rather, it likely considered Dr. Farley's actions as an element of the overall agreement between Dr. Matthews and Cottonwood Ob/Gyn.

Plaintiffs also claim that the district court erred in giving credence to the alleged concerns about their obstetrical anesthesiology skills. They argue that because Dr. Matthews offered Drs. Diaz and Diehl two non-double covered shifts per month, any concern about their skills was merely a "red herring argument." Dr. Matthews, however, offered Drs. Diaz and Diehl those shifts on an "experimental test basis" to allow them to prove that concerns about their skills were unwarranted. Thus, the fact that Dr. Matthews offered Drs. Diaz and Diehl non-double covered shifts is not indicative of a lack of concern about their skills. In addition, the record contains evidence that there was some basis for concern about the obstetric anesthesiology skills of the plaintiffs.

Plaintiffs also point to what they consider a fundamental contradiction within the district court's rendition of the facts. The district court opinion contained the following two statements: (1) "[T]he ob/gyn doctor or patient had no realistic choice but to use the anesthesiologist on call when an obstetric case presented itself," Diaz, 15 F. Supp.2d at 1147; and (2) "The agreement enables the patient or ob/gyn doctor performing a procedure to choose which anesthesiologist he or she will use rather than requiring the doctor to use whichever anesthesiologist happens to be on call," Id. at 1148. The statements are not fundamentally contradictory; rather, they are easily reconciled. In the first statement, the district court describes the situation as it existed prior to the

- 15 -

Matthews/Cottonwood Ob/Gyn agreement; and in the second statement, the district court describes the situation as it existed after the agreement. Before the agreement, neither the ob/gyn doctor nor the patient could choose an anesthesiologist. After the agreement, Cottonwood Ob/Gyn doctors could tell Dr. Matthews which anesthesiologists they preferred for their patients. Then, whenever a non-preferred anesthesiologist was on the labor and delivery schedule, a preferred anesthesiologist could be scheduled as well to provide services for the Cottonwood Ob/Gyn patients. The district court made these observations in support of its conclusion that the agreement increased user choices.

Thus, plaintiffs' first argument fails. They have not demonstrated that the district court relied on an inaccurate or inconsistent characterization of the facts in reaching its decision.

B. *Per Se* Versus Rule of Reason Analysis

Plaintiffs next argue that the district court erred in finding that *per se* analysis does not govern the conduct of the defendants in this case. We agree with the district court's resolution of this issue and we find its analysis thorough; therefore, we adopt much of its reasoning in this opinion.

Section 1 of the Sherman Act prohibits "every contract, combination . . . or conspiracy in restraint of trade or commerce . . . ." 15 U.S.C. § 1. The Sherman

Act's prohibition generally precludes only restraints that are unreasonable. See Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., 472 U.S. 284, 289, 105 S. Ct. 2613, 86 L. Ed.2d 202 (1985). The Supreme Court has developed two main analytical approaches for determining whether a defendant's conduct unreasonably restrains trade: the *per se* rule and the rule of reason. The rule of reason is the usual method of analyzing conduct under the Sherman Act. See Northwest Wholesale, 472 U.S. at 289. It requires "the fact finder [to] weigh[] all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 49, 97 S. Ct. 2549, 2557, 53 L. Ed.2d 568 (1977). *Per se* analysis is reserved for "'agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.'" Northwest Wholesale, 472 U.S. at 289 (quoting Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 5, 78 S. Ct. 514, 518, 2 L. Ed.2d 545 (1958)). "The decision to apply the *per se* rule turns on 'whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output . . . or instead one designed to increase economic efficiency and render markets more, rather than

less, competitive.'" Id. at 289-90 (quoting Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1, 19-20, 99 S. Ct. 1551, 1562-63, 60 L. Ed.2d 1 (1979) (further quotations and citations omitted)). Because plaintiffs conceded below that they did not have sufficient evidence to proceed under a theory that defendants' conduct violated the rule of reason, if we find, as the district court did, that the *per se* rule does not apply, the order dismissing plaintiffs' antitrust claims must be affirmed.

Plaintiffs allege that defendants engaged in a horizontal restraint of trade in the form of a group boycott. In Northwest Wholesale, the Supreme Court clarified its earlier language from Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S. Ct. 705, 3 L. Ed.2d 741 (1959), and held quite clearly that not all group boycotts or horizontal restraints of trade are to be judged under a *per se* standard. See Northwest Wholesale, 472 U.S. at 295. There, the court stated that unless the defendants in a group boycott situation "possess[] market power or exclusive access to an element essential to effective competition, the conclusion that expulsion [of the plaintiff] is virtually always likely to have an anticompetitive effect [thereby invoking a *per se* analysis] is not warranted." Id. at 296. The Court also stated that in *per se* cases, "the practices were generally not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive." Id. at 294.

With regard to each of the three factors mentioned above, we agree with the district court that "[t]he present situation is quite different from the Supreme Court cases meriting *per se* review." Diaz, 15 F. Supp.2d at 1146. There is no showing that the defendants hold a dominant position in a relevant market; the defendants did not control access to an element "essential" to enable plaintiffs to compete; and the agreements the plaintiffs challenge did, in some regards, make the markets more competitive.

First, plaintiffs have not shown that defendants hold a dominant position in a relevant market. As stated by the district court:

> In this case, the plaintiffs have not alleged market power on the part of the defendants. Indeed, the plaintiffs have not defined any relevant market. Accordingly, the court has no basis on which to determine the size of Cottonwood Ob/Gyn's and Old Farm Ob/Gyn's practices at Cottonwood Hospital compared to other ob/gyn groups or how significantly the agreement between Dr. Matthews and Cottonwood Ob/Gyn and Old Farm Ob/Gyn affects the plaintiffs' or other anesthesiologists' ability to practice ob/gyn anesthesia at Cottonwood Hospital or any other relevant geographic market.

Diaz, 15 F. Supp.2d at 1148.

Second, the defendants did not control access to an element "essential" to plaintiffs' ability to compete. The plaintiffs remained free to practice anesthesiology at Cottonwood and free to compete to increase their access to ob/gyn patients. Although agreements between the individual defendants and the two groups of doctor-users of anesthesiology services effectively precluded the

- 19 -

plaintiffs from performing anesthesiology services on Cottonwood Ob/Gyn and Old Farm Ob/Gyn patients during the term of the agreements, that result is a necessary consequence of all such agreements between providers and users of goods and services. Here, plaintiffs could compete for all the other ob/gyn work, and there is no showing by plaintiffs of the percentage of the market that was precluded because of the agreements with Cottonwood Ob/Gyn and Old Farm Ob/Gyn. In addition, the agreements with Cottonwood Ob/Gyn and Old Farm Ob/Gyn were apparently terminable-at-will, and there is no showing that plaintiffs were precluded from trying to improve their skills and relationships with doctors in order to compete for business with the doctors in those groups. Finally, plaintiffs still had staff privileges and could utilize Cottonwood Hospital to service their own patients.[9]

Third, Northwest Wholesale explicitly allows courts to consider plausible arguments concerning procompetitive effects in determining whether the *per se* rule or the rule of reason should apply to a horizontal group boycott. See

_____

[9] This case is easily distinguishable from Full Draw Productions v. Easton Sports, Inc., 182 F.3d 745 (10th Cir. 1999), where this court reversed the district court's dismissal of an antitrust claim for failure to allege antitrust injury adequately. In Full Draw, the plaintiffs alleged that the defendants' group boycott cut off their access to suppliers and exhibitors of archery goods and services, which was an essential element for the plaintiff to be able to compete in the market of sponsoring trade shows for archery products. See Full Draw, 182 F.3d at 751. We found the plaintiffs' allegations sufficient to state a violation of § 1 of the Sherman Act. See id.

<u>Northwest Wholesale</u>, 472 U.S. 284, 294 (stating that group boycott cases analyzed under the *per se* rule "were generally not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive"). If there are no such plausible arguments, "the likelihood of anticompetitive effects is clear and the possibility of countervailing procompetitive effects is remote." <u>Id.</u> Here, the defendants advance a plausible argument that the agreements in question actually enhanced competition by increasing a doctor's ability to choose which anesthesiologists he or she would use at Cottonwood Hospital. Before the agreements, the ob/gyn doctors largely had to accept whoever was scheduled to be on shift at the time of any particular delivery. This argument further counsels against use of the *per se* approach.

Finally, the fact that the conduct at issue in this case concerns decisions relating to health care presents a further reason why we should be cautious in applying a *per se* test. Because agreements pertaining to the provision of health care services often raise issues of professional medical judgment, it is typically useful to apply a rule of reason approach:

> Allegations of a concerted refusal to deal arise frequently in the health care industry. Denial of hospital staff privileges is frequently alleged to be the product of a group boycott organized by competing health care providers. In such cases, the courts have generally applied the rule of reason, holding that a hospital must be allowed, in conjunction with its medical staff, to exclude individual doctors on the basis of their lack of professional competence or unprofessional conduct. Actions to enforce ethical rules by medical associations are

also frequently alleged to constitute a group boycott. Again, the courts generally apply the rule of reason, examining whether the rules serve a legitimate purpose in establishing professional standards of care without unduly limiting competition among providers.

ABA Section of Antitrust Law, Antitrust Law Developments 118 (4th ed. 1997) (citations omitted). We cannot say that the type of internal hospital scheduling practice at issue in this case is the kind of practice that has historically posed anticompetitive consequences. As the district court here observed:

> Furthermore, this case deals with a call system that appears to be common throughout the health care industry. The unique nature of the call system and the relative inexperience of the courts in understanding and regulating internal hospital scheduling practices make it wholly inappropriate to justify condemning one type of scheduling practice as *per se* violative of the Sherman Act. The United States Supreme Court has cautioned that "It is only after considerable experience with certain business relationships that courts classify them as *per se* violations." Broadcast Music, Inc., 441 U.S. at 9. It may be that this type of scheduling practice actually involved a combination or concerted action by the defendants and that it is anticompetitive, but such a conclusion should only be reached after an analysis of all relevant factors under the Rule of Reason. In sum, defendants' alleged practice is not the type that regularly poses anticompetitive consequences. Consequently, *per se* analysis is not appropriate.

Diaz, 15 F. Supp.2d at 1147-48; see also Retina Assoc. v. Southern Baptist Hosp., 105 F.3d 1376, 1381-82 (11th Cir. 1997) (finding *per se* analysis inappropriate for an opthalmological care provider group's allegedly exclusive referral practices, in part because the effect of the referral practices was "not fully understood" and

had not been historically shown to always or almost always adversely affect competition).

Therefore, we find that plaintiffs have not shown that the conduct at issue in this case constitutes the type of horizontal group boycott deserving of *per se* analysis. They have failed to "present a threshold case that the challenged activity falls into a category likely to have predominately anticompetitive effects." Northwest Wholesale, 472 U.S. 284, 298.

Plaintiffs' citations to this court's decisions in Brown v. Presbyterian Healthcare Servs., 101 F.3d 1324 (10th Cir. 1996), Coffey v. Healthtrust, 955 F.2d 1388 (10th Cir. 1992), and Tarabishi v. McAlester Regional Hospital, 951 F.2d 1558 (10th Cir. 1991), are unavailing. Brown is distinguishable from the present case because it did not even involve the issue of whether to use a *per se* or rule of reason standard in evaluating the defendant's conduct. The only antitrust issue in that appeal was an issue of causation. See Brown, 101 F.3d at 1334-1335. Furthermore, factually we note that the plaintiff in Brown was denied all privileges to practice at the hospital in question, see Brown, 101 F.3d at 1328, whereas here, the plaintiffs continued to be able to practice at Cottonwood.

Although Coffey indicated that a horizontal, as opposed to a vertical, group boycott is a *necessary* condition for application of the *per se* rule, it did not imply, as plaintiffs suggest, that it was a *sufficient* condition for using the *per se*

rule.  See Coffey, 955 F.2d at 1392.  In fact, the holding of Northwest Wholesale is inconsistent with such a suggestion.  See Northwest Wholesale, 472 U.S. at (finding that the rule of reason governed the legality of horizontal agreements that resulted in the expulsion of a competitor from a purchasing cooperative).  Thus, contrary to plaintiffs' suggestion, Coffey does not dictate that because defendants engaged in horizontal agreements that limited plaintiffs' access to ob/gyn anesthesiology, *per se* analysis must govern their conduct.

Tarabishi actually lends support to the district court's decision that a *per se* analysis is inappropriate in the present situation.  In Tarabishi, this court relied in part on the fact that the defendants had terminated the plaintiff doctor's staff privileges "at least ostensibly because of a lack of professional competence or unprofessional conduct," in order to conclude that "Weiss does not dictate the use of *per se* analysis."[10]  Tarabishi, 951 F.2d at 1570 n.18.  The court in Tarabishi stated, "Denying staff privileges to a physician through peer review on the basis that the physician's conduct is unprofessional and inappropriate is not an activity 'likely to have predominantly anticompetitive effects' such that *per se* treatment

_____

[10] The reference is to Weiss v. York Hospital, 745 F.2d 786, 818-20 (3rd Cir. 1984), a case in which the Third Circuit analyzed a situation it found analogous to a traditional boycott under the *per se* rule.  Because Weiss involved facts different from those present here, and because the statements in Weiss regarding analysis of group boycotts were superseded by the Supreme Court's ruling in Northwest Wholesale, we do not find Weiss instructive in our analysis in this case.

- 24 -

is necessary." Id. at 1571 (citation omitted).  Here, although there was not a "peer review," the conduct of the defendants was similarly motivated, at least in part, by issues of the plaintiffs' competency to provide medical services.  That suggests that this claim is a poor candidate to be evaluated under a *per se* standard of review.

## III.  CONCLUSION

We find that the district court did not rely on an inaccurate and internally inconsistent characterization of the facts in reaching its decision, and we agree with the district court that *per se* analysis does not govern the conduct at issue in this case.  We also find no error in the district court's recognition of the plausible procompetitive justifications for the agreement between Dr. Matthews and Cottonwood Ob/Gyn.  Therefore, we AFFIRM the district court's order granting summary judgment to the individual defendants and dismissing the plaintiffs' claims against all of the defendants.