**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 21, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

ASSOCIATION OF SURGICAL
ASSISTANTS,

    Plaintiff - Appellant,

v.

NATIONAL BOARD OF SURGICAL
TECHNOLOGY AND SURGICAL
ASSISTING; ASSOCIATION OF
SURGICAL TECHNOLOGISTS,

    Defendants - Appellees.

No. 23-1344

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:22-CV-02363-MEH)**
_____

Robert D. Lantz, Lantz Law Group, Evergreen, Colorado, for Plaintiff-Appellant.

John W. Mackay, Ray Quinney & Nebeker P.C., Salt Lake City, Utah (Brian R. Markley, Spencer Fane LLP, Overland Park, Kansas, and Jose A. Castro, Spencer Fane LLP, Denver, Colorado, with him on the brief) for Defendants-Appellees.
_____

Before **TYMKOVICH**, **MATHESON**, and **McHUGH**, Circuit Judges.
_____

**TYMKOVICH**, Circuit Judge.
_____

    This case involves the certification process for two types of professionals who

assist surgeons in the operating room: Surgical Technologists and Surgical Assistants.

Technologists ensure a sterile and organized environment, while Assistants directly aid the surgeon. Professional organizations serve each profession. The Association of Surgical Technologists (AST) represents Technologists, and the Association of Surgical Assistants (ASA) represents Assistants. The National Board of Surgical Technology and Surgical Assisting (NBSTSA) is one of several certifying bodies for both Technologists and Assistants.

Many states require Technologists and Assistants to maintain certifications to practice their respective professions. Like other professional certifications, maintaining these certifications requires either periodically logging enough continuing education credits or retaking a certification exam. This lawsuit is about who can provide continuing education services for recertifying NBSTSA certifications. To date, NBSTSA has only authorized AST to administer continuing education services. ASA wants to join it as an education provider.

After NBSTSA refused to authorize ASA to provide continuing education services on its behalf, ASA sued NBSTSA and AST for antitrust violations and tortious business interference. NBSTSA and AST moved to dismiss ASA's Complaint. The district court granted that motion.

We affirm. As the district court correctly explained, ASA fails to establish the threshold requirement of an antitrust claim: the relevant market. Independently, it also failed to plead a plausible conspiracy or valid antitrust injuries.

2

# I.    Background

## A.  *Surgical Assistant and Surgical Technologist – Certifications*

Unless otherwise noted, we take the following material factual allegations as true for purposes of reviewing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Where noted, and as the district court before us did, we take judicial notice of public information that is not reasonably subject to dispute.  *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007) (taking judicial notice of information on Northrop Grumman's website and noting "[i]t is not uncommon for courts to take judicial notice of factual information found on the world wide web").

Surgical Assistants are "advanced allied health practitioners" who aid a surgeon with "wound closure, bleeding control, and other interoperative technical functions that help the surgeons carry out a safe operation."[1]  Technologists, in contrast, "ensure a sterile and organized environment."[2]  NBSTSA certifies both Assistants and Technologists.  Its certifications are called Certified Surgical First Assistant (CSFA) and Certified Surgical Technologist (CST), respectively.  To obtain either certification, applicants must take an initial four-hour examination, and to renew a certification

---

[1] *Surgical First Assistant*, Mayo Clinic College of Medicine & Science, https://college.mayo.edu/academics/explore-health-care-careers/careers-a-z/surgical-first-assistant/ (last visited Dec. 9, 2024).

[2] *Surgical Technologist*, Mayo Clinic College of Medicine & Science, https://college.mayo.edu/academics/explore-health-care-careers/careers-a-z/surgical-technologist/ (last visited Dec. 9, 2024).

applicants must complete a certain number of continuing education credits *or* retake the examination.[3]

Currently, ten states require an NBSTSA certification to practice as a Technologist or Assistant. But NBSTSA—through AST (the professional association for Technologists and co-defendant in this lawsuit)—lobbies for that number to increase. FAC ¶ 15. Thus, while NBSTSA's certifications remain voluntary in most states, "they are nevertheless valuable" to Technologists and Assistants because "many employers require" NBSTSA certification, "and such certifications are a pathway to higher pay and upward mobility." Ord. at 2; FAC ¶ 10. NBSTSA currently certifies 60,000 Technologists and Assistants across the nation and administers its certification exam to roughly 11,000 candidates per year. FAC ¶ 11.

NBSTSA is not the only certifier of Assistants and Technologists. For Assistants, the National Surgical Assistant Association (NSAA) and American Board of Surgical Assistants (ABSA) offer competing certificates: the Certified Surgical Assistant (CSA) and Surgical Assistant-Certified (SA-C). For Technologists, the National Center for Competency Testing (NCCT) offer the Tech in Surgery (TS-C). The following table summarizes these certifications:

---

[3] *Renewals & Recertification*, NBSTSA, https://www.nbstsa.org/renewals-recertification (last visited Dec. 9, 2024); *On Test Day*, NBSTSA, https://www.nbstsa.org/test-day (last visited Dec. 31, 2024). Although ASA alleged "continuing education is mandatory for all CSTs and CSFAs," FAC ¶ 13, that allegation is contradicted by NBSTSA's website. On appeal, moreover, ASA does not dispute that CST and CSFA holders may recertify by retaking an exam. *See, e.g.*, Aplt. Br. at 4, 16; Reply Br. at 7.

| Certifying Body | Technologist certification | Assistant Certification |
|---|---|---|
| NBSTSA | CST | CSFA |
| NSAA | | CSA |
| ABSA | | SA-C |
| NCCT | TS-C | |

## B. Certification Renewal / Recertification Services

NBSTSA requires its certificate holders to periodically renew their certifications. Holders can renew two ways: (1) through completing continuing education credits or (2) by retaking a certification exam. "Most renew" via continuing education credits.[4] According to ASA, NBSTSA has vested AST with sole authority to "approve, process, and record [continuing education] credits"—which ASA calls "Recertification Services." FAC ¶¶ 14, 15. The crux of this lawsuit is who can provide these Recertification Services.

Until December 2020, ASA and AST were affiliated, and ASA offered its members Recertification Services through an agreement with AST. At the end of 2020, ASA decided to separate from AST; aiming to create a distinct professional organization to better serve Assistants. As alleged, providing Recertification Services is critical to a professional organization's ability to serve its members. FAC ¶ 20.

---

[4] *Id.* ("Certificate holders are welcome to renew their CST or CSFA credential by testing. Most renew with AST approved continuing education credits submitted to" AST.).

ASA alleges it contacted NBSTSA sometime in September 2021 requesting authorization to provide Recertification Services.  FAC ¶ 34.  NBSTSA communicated this request to AST.  FAC ¶ 35.  Allegedly, NBSTSA—*together* with AST—formulated a response, which NBSTSA then *unilaterally* delivered.  FAC ¶¶ 35–36.  This response gave ASA two options:

(1) it could negotiate with AST for AST to continue performing Recertification Services for its members, which would require an "additional cost" to those members (relative to the cost charged for AST members); or

(2) ASA could supply "substantial proprietary and financial information" to NBSTSA "without any indication the requested material was necessary or related to any process for ASA to become an authorized provider of Recertification Services for CSTs and/or CSFAs."[5]

Order at 3 (citing FAC ¶¶ 36–39).

Almost four months later, ASA emailed NBSTSA stating it intended to "move forward" with the "approval process"—apparently a reference to option 2.  Aple. Br. at 5.  *See also* FAC ¶¶ 40, 62.  NBSTSA responded it had not set forth an "approval process" and that its prior information request did not "define any process that ASA could or should meet."  FAC ¶¶ 40, 63.  Rather, it explained "the only real pathway" was for ASA's members to go through AST for Recertification Services.  FAC ¶¶ 41, 63.

---

[5] NBSTSA requested, among other things: (a) a business plan, (b) an explanation of how continuing education processing would work for non-ASA members, (c) information about ASA's financial resources, (d) ASA's plan for staffing continuing education services, (e) ASA's IT security, and (f) ASA's continuing education course library.  Aplt. Br. at 5.  ASA never provided any of this information.  *Id.* at 6.

6

As it stands, ASA cannot provide Recertification Services and its members must pay additional sums to AST, over and above what AST charges its own members, for these services. *Id.* at ¶ 49.

### C. Lawsuit & Order Below

ASA responded by filing antitrust claims and a tortious interference claim against NBSTSA and AST, alleging they are collectively conspiring to maintain a monopoly over the market for Recertification Services and are improperly blocking ASA's entry into the same.[6] The district court dismissed ASA's Complaint, concluding it failed to

---

[6] The eleven claims ASA asserted are:

(1) 15 U.S.C. §§ 1 & 15 (restraint of trade);

(2) *Id.* (agreement in restraint of trade – unreasonable tying);

(3) 15 U.S.C. §§ 1 & 14 (unreasonable (rule of reason) forced tying);

(4) 15 U.S.C. §§ 2 & 15;

(5) 15 U.S.C. § 2 (monopolization of market for certifying CFSAs and CSAs);

(6) 15 U.S.C. § 2, (attempted monopolization of the CFSA and CSA accreditation market);

(7) 15 U.S.C. § 26 (seeking injunctive relief);

(8) Colorado Antitrust Act (CAA), Colo. Rev. Stat. § 6-4-104 (illegal restraint of trade or commerce);

(9)  Colo. Rev. Stat. § 6-4-105 (monopolization and attempt to monopolize);

(10) Colo. Rev. Stat. § 6-4-113 (injunctive relief);

(11) Tortious interference with business relations and prospective business advantage.

7

establish (1) the requisite market, (2) monopoly power and market power, (3) a conspiracy between NBSTSA and AST, and (4) an antitrust injury.

For the reasons discussed below, we agree and so affirm.

## II.    Discussion

### A.  Legal Framework

We review dismissals under Fed. R. Civ. P. 12(b)(6) de novo.  *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1104 (10th Cir. 2017).  When reviewing motions to dismiss, "[t]he question is whether, [taking] the allegations [as] true, it is plausible and not merely possible that the plaintiff is entitled to relief under the relevant law." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1192 (10th Cir. 2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

But "[p]roceeding to antitrust discovery can be expensive." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).  So we "insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed" in these cases. *Id.*

### B.  Relevant Market

One of the ways we insist upon specificity in antitrust pleadings is in defining the relevant market.  This is "a threshold requirement" for antitrust claims brought under section 2 of the Sherman Act because it "provides the framework against which economic power can be measured." *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532

F.3d 1111, 1118 (10th Cir. 2008) ("Failure to allege a legally sufficient market is cause for dismissal of [§ 2] claim[s].").

ASA also brings claims under section 1 of the Sherman Act. FAC ¶¶ 8–11. "Most claims under § 1 are subject to the 'rule of reason,' which requires us to analyze the relevant market power of the defendants and therefore requires the plaintiff to allege a valid market." *Id.* at 1119. But for "per se violations," a "failure to allege a relevant market is not fatal." *Id.*; *see also Ohio v. Am. Express Co.*, 585 U.S. 529, 543 n.7 (2018) (when alleging horizontal restraints on trade, the Supreme Court has concluded plaintiffs do "not need to precisely define the relevant market.").

To plead a plausible per se violation, plaintiffs must allege a conspiracy *between competitors* to engage in "price fixing, group boycott, or exclusive dealing arrangement[s]." *Campfield*, 532 F.3d at 1119. ASA does not argue it was relying on a theory that excused it from defining the relevant market, nor does our review of its complaint suggest that it has. For that reason, we interpret all ASA's antitrust claims as requiring a valid market definition.[7]

Identifying the relevant market enables courts to measure economic power by compelling antitrust plaintiffs to identify entities that compete, and thereby to analyze the alleged anticompetitive conduct restraining trade. *Telecor Commc'ns, Inc. v. Sw. Bell*

---

[7] ASA's Clayton Act claim (Count III) is predicated on the rule of reason, FAC ¶ 11, and so also requires a valid product market. *Campfield*, 532 F.3d at 1119 (claims subject to the "'rule of reason' . . . require[] the plaintiff to allege a valid market"); *Diaz v. Farley*, 215 F.3d 1175, 1182 (10th Cir. 2000) ("The Supreme Court has developed two main analytical approaches for determining whether a defendant's conduct unreasonably restrains trade: the *per se* rule and the rule of reason.").

*Tel. Co.*, 305 F.3d 1124, 1130 (10th Cir. 2002) (*citing SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 966 (10th Cir. 1994)).  Put another way, without reference to a legally sufficient market as a reference point, courts cannot analyze whether a defendant is monopolizing anything.

The relevant market comprises two sub-markets: (1) the product market and (2) the geographic market.  *Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1282 (10th Cir. 2004).  We consider each in turn.

### 1.  *Product Market*

"A plaintiff cannot arbitrarily choose the product market relevant to its claims; instead, the plaintiff must justify any proposed market by defining it with reference to the rule of reasonable interchangeability and cross-elasticity of demand."  *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1313 (10th Cir. 2017).

Product demand is "elastic" if its rising price causes consumers to purchase less of it.  *Campfield*, 532 F.3d at 1118.  And *cross*-price elasticity of demand exists between two products if the rising price of product A relative to product *B* causes consumers to *substitute* the relatively cheaper B for A.  *See id.*  The inference is that products A and B compete in the same market if they are reasonable substitutes for "which they are produced – price, use and qualities considered."  *Buccaneer Energy (USA) Inc.*, 846 F.3d at 1313.[8]

---

[8]  If the rising price of Whoppers relative to Big Macs, for example, causes consumers to prefer Big Macs over Whoppers, cross-price elasticity of demand exists between the hamburgers, and they are considered reasonably interchangeable

On appeal, ASA advances one product market definition: "providing, approving, processing and recording continuing education credits for CST and CSFA holders" nationwide.[9] Aple. Br. at 14; Aplt. Br. at 13. This product market definition cabins the relevant market to: (1) providing continuing education services for (2) NBSTSA's certifications. The consequence of accepting this narrow definition is that NBSTSA's *certifications* are not the "product"— AST's *Recertification Services* are. ASA's position is no other products compete in the Recertification Services "market" since AST is the only body authorized by NBSTSA to provide them.

The problem for ASA is both that certifications exist which compete against NBSTSA's *and* certificate holders have an alternative renewal option for their NBSTSA certification: retaking the certification exam. Yet ASA's Complaint makes no reference to the rule of reasonable interchangeability or cross-price elasticity of demand between these alternatives. "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand . . . even when all factual inferences are granted in plaintiff's favor, the relevant

---

substitutes. In that circumstance, an antitrust claim directed against McDonald's for its Big Mac would have to establish the relevant product market with reference to Burger King's Whopper.

[9] The district court observed that ASA "appears to have abandoned" this definition since it did not address it in its Response in Opposition to the Motion to Dismiss. Ord. at 11–12. We agree with ASA, however, that it preserved the definition since it defined "Recertification Services" as having the definition proffered here, and then used that definition throughout its briefing. On appeal, NBSTSA and AST concede that ASA did not abandon this definition. Aple. Br. at 18.

market is legally insufficient and a motion to dismiss may be granted." *Campfield*, 532 F.3d at 1118. This deficiency is glaring considering ASA's own website, which states "[o]ur association seeks to unite professionals from diverse backgrounds, including" CSFA, CSA, and SA-C certificate holders "to advance the allied health profession of surgical assisting."[10] If ASA is actively seeking to unite the profession, servicing these alternative certifications is a natural competitive pathway.

ASA admits it has defined the market so narrowly that no substitutes exist. Reply Br. at 5 ("If a market limited to providing Recertification Services to CSFA and CST holders is determined to be too narrow or unworkable, then so be it, but the market that is the subject of this dispute is limited to CSFA and CST holders."). ASA is correct that no one besides AST provides Recertification Services—as it has defined it—for NBSTSA's CSFA and CST certifications. But ASA cannot define itself out of having to deal with the competition; its proposed market definition is too narrow, and so is legally untenable. This is because "a [company's] own products do not themselves comprise a relevant product market." *Green Country Food Mkt, Inc.*, 371 F.3d at 1282. *See also TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1025 (10th Cir. 1992) ("[A] company does not violate the Sherman Act by virtue of the natural monopoly it holds over its own product.").

That is not to say downstream services for a company's products can *never* comprise a relevant secondary product market. "[I]n rare circumstances," the "products

---

[10] ASA, https://www.surgicalassistant.org/ (last visited Dec. 9, 2024).

12

of a single manufacturer" may "constitute a relevant product market." *Green Country Food Mkt., Inc.*, 371 F.3d at 1283 (citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481–82 (1992)). *Eastman Kodak* concerned the secondary market for the servicing of Kodak copy machines. Like NBSTSA and AST, Kodak argued it could never have a monopoly over its own product. But the Court determined "[t]he relevant [product] market for antitrust purposes is determined by the choices available to Kodak equipment owners." *Id.* at 481–82. "Because service and parts for Kodak equipment are not interchangeable with other manufacturers' service and parts, the relevant market from the Kodak equipment owner's perspective is composed of only those companies that service Kodak machines." *Id.* at 482. "Accordingly, only those companies that serviced Kodak machines comprised the relevant product market." *Green Country Food Mkt., Inc.*, 371 F.3d at 1283.

ASA, however, makes no attempt to analogize its situation to that in *Eastman Kodak*. Abiding by the principle of party presentation, we will not hypothesize for ASA how its situation might be like that presented there. *Nat'l Aeronautics & Space Admin. v. Nelson*, 562 U.S. 134, 147 n.10 (2011) ("[C]ourts do not sit as self-directed boards of legal inquiry and research."). *See also Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 113 (10th Cir. 2024) ("[W]e follow the principle of party presentation.").

Finally, ASA argues the procedural posture cuts in favor of reversal since "courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Nat'l Institute of First Assisting, Inc. v. Ass'n of Operating Room Nurses, Inc.*, No 19-cv-01444-TMT, 2020 WL 8189594, at *7 (D. Colo. Sept. 11, 2020); *see also Todd v. Exxon*

13

*Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market.").  *But see Campfield*, 532 F.3d at 1118 ("Failure to allege a legally sufficient market is cause for dismissal of the claim"); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436–37 (3d Cir. 1997) ("Where the plaintiff fails to define its proposed market with reference to the rule of reasonable interchangeability and cross-elasticity of demand . . . even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.").  While hesitation may be prudent in close cases, where—as here—a plaintiff facially fails to plausibly allege a relevant market, dismissal is warranted.  *See also* Reply Br. at 5 ("If a market limited to providing Recertification Services to CSFA and CST holders is determined to be too narrow or unworkable, then so be it.").

We agree with the district court that ASA's failure to address competing certification entities, their certificates, and the option to recertify via reexamination renders its product market definition "legally insufficient."  *Campfield*, 532 F.3d at 1118 (defining the relevant market is "a threshold requirement" for antitrust claims).  Consequently, ASA's antitrust claims fall short.[11]

---

[11]  We conclude ASA's Colorado antitrust claims fail for the same reason its federal claims do.  Colo. Rev. Stat. § 6-4-119 ("It is the intent of the general assembly that, in construing [the Colorado Antitrust Act], the courts shall use as a guide interpretations given by the federal courts to comparable federal antitrust laws"); *Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1220 (10th Cir. 2009) (analyzing Colorado Antitrust Act claims consistent with federal precedent).  ASA does not argue for a different approach here, and we see no reason to adopt one.

14

### 2. *Geographic Market*

Having failed to plead a legally sufficient product market, ASA's other pleading requirements also fail. Recall, for example, that the relevant "market" comprises both the product market and geographic market.

"Geographic market" refers to a product market's geographic scope, and is defined as "the narrowest market which is wide enough so that products from adjacent areas . . . cannot compete on substantial parity with those included in the market." *Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1222 (10th Cir. 1986). In other words, a geographic market is "the area of effective competition" for a given product market. *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1026 (10th Cir. 2002). ASA asserts the geographic market for Recertification Services is "nationwide." Aplt. Br. at 16.

While a small minority of states require NBSTSA's certifications to work as an Assistant or Technologist, most do not. And reexamination is an option even in those states that do. As the district court aptly stated, "[t]he differences in state laws call into question whether the various certificates compete on substantial parity with each other, nationwide." Ord. at 14.

We agree that ASA's failure to establish a sufficient product market necessarily means it also failed to define a legally sufficient geographic market.

### C. *Monopoly/Market Power*

While failing to establish the threshold market dooms ASA's antitrust claims, that is not its only problem. Establishing monopoly or market power is also a prerequisite for

15

ASA's antitrust claims. *See Buccaneer Energy (USA) Inc.*, 846 F.3d at 1311 (a Sherman Act § 1 claim under the rule of reason requires showing market power in the relevant market); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (Sherman Act § 2 claims for monopolization/attempted monopolization require proof of monopoly power in the relevant market); *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 46 (2006) ("[I]n all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product.").

*Monopoly* power requires "the power to control prices and the power to exclude competition." *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1123 (10th Cir. 2014). *Market* power requires either or. *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 967 (10th Cir. 1990). While market share is relevant to either inquiry, it alone is "insufficient to establish market power." *Buccaneer Energy (USA) Inc.*, 846 F.3d at 1315, 1318. Rather, assessing market and monopoly power "necessitates an examination of market share, barriers to entry, the number of competitors in the market, market trends, and other relevant considerations." *Id.* at 1315.

Because ASA has failed to plead a legally sufficient market, it is impossible to assess whether AST and NBSTSA have monopoly or market power in the relevant market.

### D. Conspiracy

We also conclude ASA's Complaint independently fails because it has not alleged a plausible conspiracy between NBSTSA and AST. "The essence of a claim of violation of Section 1 of the Sherman Act is the agreement itself," *Champagne Metals v. Ken-Mac*

16

*Metals, Inc.*, 458 F.3d 1073, 1082 (10th Cir. 2006), which must be "designed unreasonably to restrain trade." *Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249, 1257 (10th Cir. 2006).

The "crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Twombly*, 550 U.S. at 553. The facts showing such an agreement can be direct or circumstantial. *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1174 (10th Cir. 2019). But a "conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Twombly*, 550 U.S. at 557. "The *Twombly* Court was particularly critical of complaints that mentioned no specific time, place, or person involved in the alleged conspiracies." *Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008).

The focus of ASA's conspiracy allegations are that the "October 22, 2021, letter and the subsequent February 23, 2022, correspondence demonstrate[] Defendants agreed to cause NBSTSA to effectively boycott ASA." FAC ¶ 96. These allegations do not permit us to reasonably infer a conspiracy existed between NBSTSA and AST. As the district court properly found, "[o]ne is a letter from NBSTSA alone, on NBSTSA letterhead signed by NBSTSA executives, and the other is an email from NBSTSA alone." Ord. at 18. What is more, "[n]either mention any purported exchange or conversation with AST or plausibly indicate that NBSTSA was taking anything other than independent action rather than concerted action." *Id.*

ASA argues that when read conjunctively with six other allegations contextualizing this correspondence, it has pled a plausible conspiracy. *Christy Sports,*

17

*LLC*, 555 F.3d at 1192 (allegations must be "plausible and not merely possible"). In doing so, ASA directly states the inference it asks the court to draw: that NBSTSA and AST colluded to "develop[] a response" together. Aplt. Br. at 22–23. But the Complaint contains inadequate basis or support for this conclusory assertion. *TV Commc'ns Network, Inc.*, 964 F.2d at 1026 (internal citations omitted) ("'[B]uzz words' do[] not supply the factual circumstances necessary to support [plaintiff's] conclusory allegations."). *See also Hall v. Bellmon*, 935 F.2d 1106, 1109–110 (10th Cir. 1991) ("Conclusory allegations without supporting factual averments are insufficient to state a claim."); *Twombly*, 550 U.S. at 556–57 (a "conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.").

Allegations of conspiracy based on circumstantial evidence are "not plausible if in light of common economic experience the alleged conduct is equally likely to result from independent action." *Llacua*, 930 F.3d at 1175; *see also id.* at 1179 (conspiracy allegations "must tend[] to exclude the possibility of independent action.") (internal quotation marks omitted). Valid business justifications explain why NBSTSA might not want a relationship with ASA—including because ASA never provided NBSTSA the business information it requested. ASA's circumstantial and conclusory allegations are insufficient to establish a plausible conspiracy. *Multistate Legal Stud., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publ'ns, Inc.*, 63 F.3d 1540, 1556 (10th Cir. 1995) ("[A]mbiguous conduct that is as consistent with permissible competition as with illegal conspiracy does not by itself support an inference of antitrust conspiracy.").

18

This is an insurmountable problem for ASA, because all its antitrust claims are factually predicated on a conspiratorial agreement between AST and NBSTSA. Aplt. App'x at 37 (Count I: "by agreement"); *id.* at 38 (Count II: alleging an "Agreement in Restraint of Trade); *id.* at 41 (Count III: "NBSTSA in conjunction with AST"); *id.* (Count IV: "By agreement"); *id.* at 43 (Count V: "Through their anticompetitive conduct described herein, namely forced tying"); *id.* (Count VI: "Defendants have created and are attempting to maintain a monopoly to and for the benefit of AST"); *id.* at 45 (Count VIII: "Defendants, by agreement"); *id.* at 46 (Count IX: "By agreement").[12]

ASA's failure to plead a plausible conspiracy independently dooms its Complaint.[13]

### E. Antitrust Injury

Finally, we also agree with the district court that ASA failed to plead an antitrust injury.

> "An antitrust injury is an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendant's acts unlawful." *Reazin*, 899 F.2d at 962 n.15 (quotation omitted). The Sherman Act was designed to protect market participants from anticompetitive behavior in the marketplace. *See Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 530 (1983). Thus, "[t]he antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's

---

[12] Counts VII and X are claims for injunctive relief predicated on ASA's federal and state antitrust claims, and so rise and fall with those claims.

[13] Having dismissed all ASA's federal claims with prejudice, the district court declined to exercise supplemental jurisdiction over its remaining state tort claim. Ord. at 20. ASA flags no error with that determination, and we discern none.

behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990).

*Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1124–25 (10th Cir. 2005) (cleaned up).

The relief ASA seeks reveals its lack of injury: an order forcing NBSTSA into a business relationship with it. Aplt. Br. at 6 (ASA wants NBSTSA to provide it "guidelines, criteria, or any other pathway for ASA to become an independent and accredited provider of continuing education to its members.") (quoting FAC ¶ 43). *See also* FAC ¶¶ 89, 112 (seeking an order "compelling NBSTSA to provide ASA with specific criteria required for ASA to apply for accreditation and requiring NBSTSA to give objective consideration to ASA's application for accreditation."). Declining to enter a business relationship with a nascent startup is not a cognizable antitrust injury.

Further, this regime would first require the court to determine what "criteria" NBSTSA would need to consider in order to evaluate a business relationship with ASA and then whether NBSTSA "objective[ly]" considered those criteria—all with the presumable end of making ASA an "independent and accredited provider" of the Recertification Services. FAC ¶ 43. ASA identifies no legal authority for such a regime, and the court is aware of none. *Atl. Richfield Co.*, 495 U.S. at 344 ("The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior.").

ASA also does not have a cognizable antitrust injury because it has not plausibly alleged it has lost anything. It claims to be injured because its members must pay an

additional fee for Recertification Services above and beyond what AST members must pay. To the extent that means ASA experiences lower membership and associated fee revenues, those harms are derivative of the harms to its members and its own failure to innovate ways of serving those members. These derivative harms are not an antitrust injury. *Atl. Richfield Co.*, 495 U.S. at 344 ("[P]rocompetetive or efficiency-enhancing aspects of practices that nominally violate the antitrust laws may cause serious harm to individuals, but this kind of harm is the essence of competition and should play no role in the definition of antitrust damages") (citing William H. Page, *The Scope of Liability for Antitrust Violations*, 37 Stan. L. Rev. 1445, 1460 (1985)). *See also Tal v. Hogan*, 453 F.3d 1244, 1258 (10th Cir. 2006) (no antitrust injury where plaintiff "was not a buyer or seller in the affected market"); *Sharp v. United Airlines, Inc.*, 967 F.2d 404, 408 (10th Cir. 1992) (same where plaintiff's claimed "losses" were "tangential to any alleged harm."). Nor has ASA addressed why it cannot provide Recertification Services for the competing certifying entities, which would appear to provide an alternative competitive pathway.

At the end of the day, antitrust laws "protect competition, not a competitor." *SCFC ILC, Inc.*, 36 F.3d at 963, 972. While "our test seems onerous," it is predicated on the principle that potential competitors "might develop alternative channels" of business benefiting consumers. *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 986–87 (10th Cir. 2022), *cert. denied sub nom. Sanofi-Aventis U. S., LLC v. Mylan, Inc.*, 143 S. Ct. 1748 (2023).

ASA has not pled a cognizable antitrust injury. Those claims fail for this additional reason.

## III.   Conclusion

For the reasons stated above, we affirm the district court's dismissal with prejudice of ASA's Complaint pursuant to Rule 12(b)(6).